1  ANDERSON LAW FIRM
   MARTIN W. ANDERSON, State Bar No. 178422
2  2070 North Tustin Avenue
   Santa Ana, California 92705
3  Tel: (714) 516-2700 ▪ Fax: (714) 532-4700
   E-mail: martin@andersonlaw.net
4
   CALIFORNIA LEMON LAW CENTER, INC.
5  LUCY KASPARIAN, State Bar No. 228932
   136 N. Glendale Ave.
6  Glendale, California 91206
   Tel: (818) 547-5777 ▪ Fax: (818) 547-9777
7  E-mail: LKasparian@aol.com

8  Attorneys for Plaintiff Terry Gray

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11                 SOUTHERN DIVISION

12

13  TERRY GRAY,                          Case No. SA CV 08-00279 JVS (ANx)

14                                       **PLAINTIFF'S TRIAL
                          Plaintiff,     DECLARATIONS**
15
                                         Complaint Filed: March 12, 2008
16  v.                                   Trial Date: June 23, 2009

17
    MAZDA MOTOR OF AMERICA,
18  INC. et al.

19
                          Defendants.
20

21        TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF

22  RECORD:

23        PLEASE TAKE NOTICE THAT Plaintiff Terry Gray hereby submits the

24  attached declarations in connection with his upcoming bench trial.

25  ///

26  ///

27

28

ANDERSON LAW FIRM
2070 NORTH TUSTIN AVENUE
SANTA ANA, CALIFORNIA 92705
TELEPHONE: (714) 516-2700

# DECLARATION OF TERRY GRAY

I, TERRY GRAY, hereby declare as follows:

1.      I am the Plaintiff in this action.  From 1999 to 2009, I was employed as a Manager with State College Distributors, a flooring distribution company.  In January of 2009, my company laid me off because of an economic slowdown.

## The Lease of the Vehicle

2.      On August 17, 2007, I and my wife leased a 2007 Mazda Mazda3 ("vehicle") in Cerritos, California.  Trial Exhibit 2 is a copy of the lease agreement that I signed.  Trial Exhibit 3 is a photocopy of the window sticker on the vehicle.  Trial Exhibit 4 is an addendum to the window sticker.  The vehicle bears a manufacturer's plate on the drivers' side door jam which indicates that it was manufactured by Mazda Motor Corporation in Japan.

3.      Trial Exhibit 45 is a copy of the sales brochure for the vehicle.  Trial Exhibit 66 is the owner's manual for the vehicle.

4.      We leased the vehicle for my teenage son, James, to use.  Before we leased the car, the selling dealership had installed a genuine Mazdaspeed "sway bar" on the car.  Mazda represented to me that the sway bar would improve the vehicle's performance when going around corners.

## The Warranty

5.      Trial Exhibit 8 is a copy of the warranty booklet that I received when we leased the vehicle.  According to page 5 (the page numbers are in the upper corner of the booklet) of the warranty booklet, the warranty was issued both by Defendant Mazda Motor Corporation and Defendant Mazda North American Operations.  According to page 9 of the warranty booklet, any component of my vehicle is covered under the warranty for 3-years and/or 36,000 miles.  Because the warranty covers "any component" in the vehicle, I believe that the warranty covers the Mazda sway bar that the dealer installed before I purchased the vehicle.  In addition, according to page 36 of the warranty, genuine Mazda accessories, like the

ANDERSON LAW FIRM
2070 NORTH TUSTIN AVENUE
SANTA ANA, CALIFORNIA 92705
TELEPHONE: (714) 516-2700

sway bar, are covered for 3-years and/or 36,000 miles.  Page 7 of the warranty explains that if I have any questions regarding the vehicle, I should contact the dealership.  Page 13 advises that if I need warranty service, I should take my vehicle to an authorized Mazda dealership in the United States.

### Repair Efforts

6.     In total, I and my wife have taken the vehicle to an authorized Mazda dealership for repair of various defects eleven times.  The vehicle has been at the shop for at least 22 days in total.  We have owned the vehicle for at least 640 days and it has never been free of defects.  I feel that we have made a reasonable number of repair attempts, but Mazda has not conformed the vehicle to the terms of its warranty.

7.     Each time that we brought the vehicle into an authorized Mazda dealership, we were given a repair order.  The repair order was created by Mazda dealership personnel when we dropped the vehicle off and reflects what the service advisor typed into the dealership's computer system after we advised him what the problems were.  Each time that we picked up the vehicle, we received an invoice. The invoice repeats what is contained in the repair order and includes a statement of what the dealership states that it found and did in an attempt to repair the problem.  Trial Exhibits 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 27, 28, 29, 30, 31, 32, 33, and 34 are repair orders and invoices that we received from the dealership when I took the vehicle into authorized Mazda dealerships.

### Loud Noise from Underneath Vehicle

8.     Sometime in August of 2007, my son James reported that while he was driving the vehicle, he heard a loud clunking noise from underneath the vehicle.  I rode in the car with him and heard the noise as well.  The noise sounded like a piece of metal rubbing again another piece of metal, and then slamming into a third piece of metal.  The noise was very noticeable and disturbing.  The noise occurs at times when braking, turning a corner, backing up, going in a driveway,

ANDERSON LAW FIRM
2070 NORTH TUSTIN AVENUE
SANTA ANA, CALIFORNIA 92705
TELEPHONE: (714) 516-2700

- 3 -
PLAINTIFF'S TRIAL DECLARATIONS

1   and when hitting speed bumps.  At times, the noise sounded like it was coming

2   from the rear of the vehicle, and, at least once, it sounded like it was coming from

3   the front.  The noise sounds like it is coming from the vehicle, but outside of the

4   passenger compartment.

5          9.   My wife and I took the vehicle to an authorized Mazda dealership a

6   total of 7 times for this problem.  The following summarizes the dates the vehicle

7   was at an authorized Mazda dealership and what the dealership told me that it did

8   to repair the problem on each date:

9          a.   8/22/2007-8/23/2007 (2 days) (greased the bushings on the rear

10  stabilizer bar).

11         b.   09/04/2007-09/05/07 (2 days) (tightened the bolts on the rear

12  stabilizer bar).

13         c.   09/24/07-09/25/07 (2 days) (replaced the bracket which holds the rear

14  stabilizer bar in place).

15         d.   10/08/07-10/08/07 (1 day) (performed repairs on the front stabilizer

16  bar).

17         e.   11/12/07-11/13/07 (2 days) (no work performed).

18         f.   12/17/07-12/18/07 (2 days) (replaced the rear stabilizer bar and the

19  bushings).

20         g.   01/21/08-01/23/08 (3 days) (adjusted the bushings on the rear

21  stabilizer bar).

22         10.  This problem recurred after the last repair visit and thus was not

23  repaired.

24                              **Engine Problems**

25         11.  In September of 2007, my son James was driving the vehicle on

26  Whittier Boulevard on his way to school.  He stopped at a red light, and when he

27  hit the accelerator pedal, the engine died.  The same problem occurred again on or

28  about February 23, 2008, and on or about March 22, 2008.  In addition, when the

ANDERSON LAW FIRM
2070 NORTH TUSTIN AVENUE
SANTA ANA, CALIFORNIA 92705
TELEPHONE: (714) 516-2700

PLAINTIFF'S TRIAL DECLARATIONS

1  engine died on February 23, 2008, the check engine light came on, and the check

2  engine light came on again on June 13, 2008.

3      12.    I took the vehicle to an authorized Mazda dealership a total of 3 times

4  for this problem.  The following summarizes the dates the vehicle was at an

5  authorized Mazda dealership and what the dealership told me that it did to repair

6  the problem on each date:

7      a.    02/25/08-02/25/08 (1 day) (no work performed).

8      b.    03/24/08-03/25/08 (2 days) (dealership stated it had performed

9  repairs).

10      c.    06/13/08-06/16/08 (4 days) (dealership stated it had performed repairs

11  at Mazda's instruction).

12      13.    Although I have not personally experienced this problem since the last

13  time the vehicle was in the shop, I understand from our expert witness that the

14  problem has not been repaired and that the repairs that were performed actually

15  damaged the wiring harness on the vehicle.

16      **Impairment of Use, Value and/or Safety**

17      14.    The defects that I and my family have experienced have substantially

18  impaired the use, value, and safety of the vehicle to me and to my family.

19      15.    I leased the vehicle in order to provide my son with all of the benefits

20  that accompany a new vehicle.  Among other things, I wanted to provide him with

21  trouble-free, safe transportation.  Unfortunately, the vehicle failed to provide him

22  with any of these things.

23      16.    The noise from the vehicle is very distracting.  When driving a motor

24  vehicle, distractions can cause a collision, which can cause serious injuries, or even

25  death to the driver and those around him.  The same is true when a vehicle stalls or

26  hesitates.

27      17.    When I was in the vehicle and heard the noise, it caused me to

28  question the safety and reliability of the vehicle.  In addition, when my son told me

ANDERSON LAW FIRM
2070 NORTH TUSTIN AVENUE
SANTA ANA, CALIFORNIA 92705
TELEPHONE: (714) 516-2700

1 about the noise recurring and about the stalling and check engine light concerns,

2 this increased my concerns.  I am concerned that the sway bar may fail and that the

3 driver (most likely my son) could lose control of the vehicle.  I am also concerned

4 that if the vehicle stalls or hesitates, my son could be injured or killed in a traffic

5 accident.  While driving a vehicle always has some risk, I believe that these defects

6 significantly increase the normal risk attendant driving an automobile.

7      18.    The vehicle's use has also been substantially impaired.  First, the

8 vehicle was actually in the shop for 22 days, and I and my son were unable to use

9 it.

10      19.    My son reports that he has avoided using the vehicle because of the

11 noises and stalling, and I have avoided using it as well.  The noises are also

12 embarrassing, particularly for a teenagers (who as a group often consider motor

13 vehicles to be a particularly important part of their social life).

14      20.    My son and I both feel very nervous and angry as a result of these

15 defects.  Because my son has no other transportation and because I cannot afford to

16 buy yet another car, my son has had no choice but to use the vehicle to meet his

17 transportation needs.

18      21.    I have not sold the vehicle to anyone else and I could not in good

19 conscience do so.  If I sold this vehicle to someone else, I am afraid that I would be

20 sued by the new buyer when he learned of its defects.

21      22.    One of the reasons that I chose to lease a *new* vehicle was to receive

22 the benefits of the new vehicle warranty.  In addition, new vehicles are generally

23 regarded as having a period of trouble-free use because they are new.  In the case

24 of this vehicle, however, I did not receive the trouble-free vehicle that I paid for.

25      23.    If the dealership or if Mazda had truthfully told me about these

26 problems before I leased the vehicle, I would not have leased the vehicle.

27      24.    I do not have confidence in the reliability of this vehicle.

28      25.    In my opinion, this vehicle has no value.

ANDERSON LAW FIRM
2070 NORTH TUSTIN AVENUE
SANTA ANA, CALIFORNIA 92705
TELEPHONE: (714) 516-2700

PLAINTIFF'S TRIAL DECLARATIONS

ANDERSON LAW FIRM
2070 NORTH TUSTIN AVENUE
SANTA ANA, CALIFORNIA 92705
TELEPHONE: (714) 516-2700

**Damages**

26.    I paid a $3,500 down payment when I leased the vehicle.  I agreed to pay a total of 47 payments of $327.01 for the vehicle.  I leased the vehicle from Mazda American Credit ("leasing company"), which is not a party to this action.  At the end of the lease, I agreed to pay $9,480.60 in order to purchase the vehicle from the leasing company.  In order to return the vehicle to the Defendants as part of this action and allow them to brand the title as a lemon law buyback, it will be necessary to terminate the lease and purchase the vehicle from the leasing company.

27.    To date, I have made 21 payments of 327.01.  I currently owe $17,982 on my lease contract.

28.    To date, I have paid $490.00 for registration on the vehicle.

29.    To date, I have paid $4,000.00 for insurance on the vehicle.

30.    I spent approximately 22 to 23 hours getting the vehicle repaired and another 20 hours attempting to get the Defendant to repurchase or replace the vehicle.  At my last job, my hourly rate of pay was $50.00 per hour.

**Disability**

31.    I am disabled.  In 1972, I was involved in a car accident.  As a result of the accident, my left leg was amputated below the knee.  I walk with an obvious limp, and my disability was obvious to the Mazda dealers when I visited them for repairs to my vehicle.  As a result of Defendant's conduct, I have suffered the loss of the money that I paid for the vehicle, which I use for "family care and maintenance," i.e. my son's transportation.  In addition, I disclosed this fact to Mazda during my deposition, yet Mazda still has not repurchased my vehicle.

///

///

ANDERSON LAW FIRM
2070 NORTH TUSTIN AVENUE
SANTA ANA, CALIFORNIA 92705
TELEPHONE: (714) 516-2700

## The Tires

32.    At no time during any of these repair visits did anyone at an authorized Mazda dealership advise me that any of these problems were caused by or related to the tires, or that the tires had any significance to any of the concerns. Rather, the dealers advised me that the noise was caused by poor fit between the stabilizer bar and the bushings where it attaches to the vehicle.  The dealers advised me that the engine related problems were caused by a defective part inside the engine area.

33.    About a week before the defense vehicle inspection was scheduled, I noticed that the tires on the vehicle were worn out.  Because my teenage son drives the vehicle, I arranged to have the tires replaced at a local tire dealer.  At the time that I did so, I had no reason to suspect that the tires had any relevance to the action.  Rather, I was performing routine maintenance and keeping the vehicle safe for my son to drive.

34.    I knew that a vehicle inspection was scheduled for the following week, and I assumed that Mazda and its representatives would prefer the car to be in safe condition.  If I had any reason to believe that the tires were relevant to our case, I would have preserved them.  At no time prior to replacing the tires did anyone at Mazda advise me that the tires were important.

I declare under penalty of perjury that the foregoing is true and correct.
DATED:  June 2, 2009

See Next Page for Signature

TERRY GRAY

ANDERSON LAW FIRM
2070 NORTH TUSTIN AVENUE
SANTA ANA, CALIFORNIA 92705
TELEPHONE: (714) 518-2700

**The Tires**

32.    At no time during any of these repair visits did anyone at an authorized Mazda dealership advise me that any of these problems were caused by or related to the tires, or that the tires had any significance to any of the concerns. Rather, the dealers advised me that the noise was caused by poor fit between the stabilizer bar and the bushings where it attaches to the vehicle. The dealers advised me that the engine related problems were caused by a defective part inside the engine area.

33.    About a week before the defense vehicle inspection was scheduled, I noticed that the tires on the vehicle were worn out. Because my teenage son drives the vehicle, I arranged to have the tires replaced at a local tire dealer. At the time that I did so, I had no reason to suspect that the tires had any relevance to the action. Rather, I was performing routine maintenance and keeping the vehicle safe for my son to drive.

34.    I knew that a vehicle inspection was scheduled for the following week, and I assumed that Mazda and its representatives would prefer the car to be in safe condition. If I had any reason to believe that the tires were relevant to our case, I would have preserved them. At no time prior to replacing the tires did anyone at Mazda advise me that the tires were important.

I declare under penalty of perjury that the foregoing is true and correct.

DATED:  June 2, 2009


TERRY GRAY

1

## DECLARATION OF JAMES GRAY

2       I, JAMES GRAY, hereby declare as follows:

3       1.      I am the son of the Plaintiff in this action.  I have read the facts stated

4  in the Declaration of Terry Gray, above.  The facts stated in his Declaration are

5  true, and I agree with his statements about the use, value, and safety of the vehicle.

6  In addition to those facts, I wish to add the following:

7                              ### The Lease of the Vehicle

8       2.      On August 17, 2007, my parents leased a 2007 Mazda Mazda3

9  ("vehicle") in Cerritos, California.  They leased the vehicle for me to use.  Before

10  we leased the car, the selling dealership had installed a genuine Mazdaspeed "sway

11  bar" on the car.  Mazda represented to me that the sway bar would improve the

12  vehicle's performance when going around corners.

13                          ### Loud Noise from Underneath Vehicle

14      3.      Sometime in August of 2007, while I was driving the vehicle, I heard

15  a loud clunking noise from underneath the vehicle.  The noise sounded like a piece

16  of metal rubbing again another piece of metal, and then slamming into a third piece

17  of metal.  The noise was very noticeable and disturbing.  The noise occurs at times

18  when braking, turning a corner, backing up, going in a driveway, and when hitting

19  speed bumps.  At times, the noise sounded like it was coming from the rear of the

20  vehicle, and, at least once, it sounded like it was coming from the front.  The noise

21  sounds like it is coming from the vehicle, but outside of the passenger

22  compartment.  The noise has been quieted by the repairs that were performed, but

23  it has not gone away completely.

24                                   ### Engine Problems

25      4.      In September of 2007, I was driving the vehicle on Whittier Blvd. on

26  my way to school.  I stopped at a red light, and when I hit the accelerator pedal, the

27  engine died.  It also happened several other times, but I kept no records of when it

28  happened and I do not know the exact dates when it happened.

ANDERSON LAW FIRM
2070 NORTH TUSTIN AVENUE
SANTA ANA, CALIFORNIA 92705
TELEPHONE: (714) 516-2700

- 9 -

5.      The same problem occurred again on or about February 23, 2008, and on or about March 22, 2008.  In addition, when the engine died on February 23, 2008, the check engine light came on, and the check engine light came on again on June 13, 2008.

6.      Although the check engine light has not illuminated since the last repair visit, the vehicle continues to experience engine related problems.  Specifically, at times, the engine stutters, stumbles, or hesitates when I attempt to accelerate the vehicle.

**Impairment of Use, Value and/or Safety**

7.      The defects that I and my family have experienced have substantially impaired the use, value, and safety of the vehicle to me.

8.      The noise from the vehicle is very distracting.  When driving a motor vehicle, distractions can cause a collision, which can cause serious injuries, or even death to the driver and those around him.  The same is true when a vehicle stalls or hesitates.

9.      When I was in the vehicle and heard the noise, it caused me to question the safety and reliability of the vehicle.  I am concerned that the sway bar may fail and that I could lose control of the vehicle.  I am also concerned that if the vehicle stalls or hesitates, I could be injured or killed in a traffic accident.  While driving a vehicle always has some risk, I believe that these defects significantly increase the normal risk attendant driving an automobile.

10.     The vehicle's use has also been substantially impaired.  First, the vehicle was actually in the shop for 22 days, and I was unable to use it.

11.     I have avoided using the vehicle because of the noises and stalling, and I have avoided using it as well.  The noises are also embarrassing.

12.     I feel very nervous and angry as a result of these defects.  Because I have no other transportation and because I cannot afford to buy a car, I have had no choice but to use the vehicle to meet my transportation needs.

ANDERSON LAW FIRM
2070 NORTH TUSTIN AVENUE
SANTA ANA, CALIFORNIA 92705
TELEPHONE: (714) 516-2700

PLAINTIFF'S TRIAL DECLARATIONS

13.     If the dealership or if Mazda had truthfully told me about these problems before I leased the vehicle, I would not have asked my parents to lease this vehicle for me.  I do not have confidence in the reliability of this vehicle.  In my opinion, this vehicle has no value.

I declare under penalty of perjury that the foregoing is true and correct.

DATED:  June 2, 2009

See Next Page for Signature

_____
JAMES GRAY

ANDERSON LAW FIRM
2070 NORTH TUSTIN AVENUE
SANTA ANA, CALIFORNIA 92705
TELEPHONE: (714) 516-2700

13.     If the dealership or if Mazda had truthfully told me about these problems before I leased the vehicle, I would not have asked my parents to lease this vehicle for me. I do not have confidence in the reliability of this vehicle. In my opinion, this vehicle has no value.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: June 2, 2009

James Gray
JAMES GRAY

ANDERSON LAW FIRM
2070 NORTH TUSTIN AVENUE
SANTA ANA, CALIFORNIA 92705
TELEPHONE: (714) 510-2700

PLAINTIFF'S TRIAL DECLARATIONS

ANDERSON LAW FIRM
2070 NORTH TUSTIN AVENUE
SANTA ANA, CALIFORNIA 92705
TELEPHONE: (714) 516-2700

## DECLARATION OF DAN CALEF

I, DAN CALEF, hereby declare as follows:

1.    I have been retained to act as an expert in this action.  Exhibit 74, which is Plaintiff's expert witness disclosures, includes a copy of my report and my resume.  All of the facts stated in my report and my resume are incorporated into this Declaration by reference.

### The Vehicle

2.    The vehicle is a red 2007 Mazda Mazda3.  According to the plate attached to the driver's side door jam, the vehicle was manufactured by Mazda Motor Corporation in Japan.  Among other things, the vehicle has an upgraded MazdaSpeed sway bar installed on the front and rear of the vehicle.  Based upon my review of the relevant documentation, it appears that this item was installed by the dealership prior to the original lease to the Plaintiff.  As a result, it is covered by the Mazda North American Operation's and Mazda Motor Corporation's factory warranty.

### Preparation

3.    On July 22, 2007, I inspected the vehicle which is the subject of this action.  Trial Exhibit 56 is a series of photographs that I took during my inspection of the vehicle on July 22, 2007.  The photographs marked as 56-2 to 56-49 and 56-54 to 56-75 depict the vehicle which is the subject of this action.  The photographs marked as 56-50 to 56-53 depict a blue Mazda3 vehicle which was used as an exemplar.

4.    As I indicate in my report, I also reviewed each of the repair orders and invoices issued by Mazda's dealerships, reviewed publicly available repair manuals published by Mitchell (which is the leading provider for automotive repair manuals), reviewed Mazda's TSB's (which Mitchell provides to the public), and reviewed the expert reports from Defendant's experts (Roger Tarver (Trial Ex. 57) and Jonathan Butts (Trial Ex. 58)).

5.      In addition, after I issued my report, Defendant's counsel produced some additional documents, including the MazdaSpeed Sway Bar Kit Installation Instructions (Trial Exhibit 10), The Mazda3 sales brochure (Trial Exhibit 45), the MazdaSpeed Sway Bar Engineering Specifications (Trial Exhibit 61), and the Mazda3 MazdaSpeed Sway Bar Kit:  Proving Grounds Evaluation (Trial Exhibit 62).

### Summary of My Opinions:  Engine Defect

6.      Based upon my review of all of the records identified above and my experience and expertise, I believe that the vehicle has suffered from a defect which causes the engine to stall, the check engine light to come on, and the vehicle to hesitate or stutter upon acceleration.  It is my opinion that a single defect has caused each of these conditions to occur (hereafter "Engine Defect").  I believe that the Engine Defect has manifested itself in different ways (i.e., sometimes the check engine light comes on, sometimes the vehicle stalls, and sometimes the vehicle hesitates) because other factors (i.e., engine temperature, external temperature, vehicle speed, vehicle load, vibration, etc.) which affect the defect have been different each time the failure has manifested itself.  I do not know the exact cause of the Engine Defect, and, due to the intermittent nature of the defect it could take dozens of hours of fault tracing to determine the cause.

7.      I believe that the Engine Defect has not been repaired.  I also believe that it is unlikely that Mazda will ever be able to repair the Engine Defect, because Mazda and its dealerships are either unwilling or unable to diagnose the cause of the problem.  I also believe that the repair that was attempted in order to repair this problem did not repair the problem.  In fact, the repair was performed so poorly that it is likely to cause additional problems in the future.

8.      These opinions are based upon the following facts:

ANDERSON LAW FIRM
2070 NORTH TUSTIN AVENUE
SANTA ANA, CALIFORNIA 92705
TELEPHONE: (714) 516-2700

**<u>Basis for Opinions:  Engine Defect</u>**

9.      The repair orders show that Plaintiff delivered the vehicle to an authorized Mazda dealership at least three times for repair of these concerns.  *See* Trial Exhibit 31, 32, and 34.

10.      During the first visit (Exhibit 31) in February of 2008, Plaintiff complained that the vehicle had stalled several times in the three preceding months, and had first stalled in September of the preceding year.  The repair records claim that the dealership checked the vehicle for codes and drove the car nine miles.  The dealership did nothing to repair the vehicle.

11.      In my opinion, the efforts to diagnose the problem during this visit were totally inadequate.  A stalling condition is very, very dangerous.  When a vehicle stalls on the freeway or in an intersection, there is a very grave risk of serious injury to the driver, passengers, and to anyone else who is driving in the area.

12.      Given the seriousness of a stalling concern, the dealership personnel should have interviewed the driver to gather more information about the concern, contacted Mazda to determine if Mazda knew anything about the concern, and continued driving the vehicle on and off until the condition duplicated itself.  Instead, the Mazda dealership appears to have driven the vehicle for about 9 miles.  Either Mazda does not have technicians with the skills and/or training necessary to properly diagnose the stalling concern, the Mazda dealer and/or technician knew that Mazda would not pay for that level of diagnostic effort, they assumed that the customer was lying about having experienced several stalling incidents.

13.      Mazda's total failure to exercise reasonable diligence in repairing the concern can be explained by Mazda's method of paying its dealerships (and its dealership employees) for performing warranty repairs.  Mazda only pays its dealerships (and dealership personnel are only paid by their dealership) when they actually perform a repair, and then, based on a flat rate (usually .5 to 1.0 hours) for

A N D E R S O N   L A W   F I R M
2070 NORTH TUSTIN AVENUE
SANTA ANA, CALIFORNIA 92705
TELEPHONE: (714) 516-2700

PLAINTIFF'S TRIAL DECLARATIONS

the diagnosis and the flat rate time to perform *the repair*. As a result, the dealership personnel have a disincentive to spend the proper amount of time necessary to diagnose and repair intermittent concerns such as this one, which might involve hours and hours of diagnostic work and only a few minutes of repair time. In addition, when faced with repeated visits for the same problem, dealerships personnel have a perverse incentive to invent a repair that pays them for work they have done, even if the repair is not necessary. Dealerships personnel also have an incentive to do work quickly and to take shortcuts when performing work, because they are usually paid a flat rate for a given repair regardless of how long they actually spend doing the repair.

14.     For this visit (Ex. 31), the records show that the dealership personnel billed .0 hours for their efforts, and thus, they were paid nothing for their diagnostic efforts on this occasion.

15.     It is likely that the dealership personnel spent no more than 15 minutes attempting to diagnose this concern. It would likely have taken dozens of hours of effort to duplicate the problem and then diagnose the actual cause.

16.     Plaintiff's second repair attempt for the Engine Defect occurred in March of 2008 (Ex. 32). This time, Plaintiff presented the vehicle for repair and again complained that the vehicle had stalled and the check engine light was on.

17.     The fact that the vehicle had continued stalling and the check engine light had come on is very important for several reasons. The fact that both conditions occurred makes it very probable that both concerns are related. Furthermore, as no repairs were attempted during the first visit, it is very likely that this Engine Defect had manifested itself with additional symptoms due to degradation and because of differences in other factors, such as engine temperature, external temperature, vehicle speed, load, etc.

18.     When a check engine light comes on, it indicates that one of the vehicle's sensors is reporting information which is outside of the vehicle's

ANDERSON LAW FIRM
2070 NORTH TUSTIN AVENUE
SANTA ANA, CALIFORNIA 92705
TELEPHONE: (714) 516-2700

PLAINTIFF'S TRIAL DECLARATIONS

1   specifications.  That information is stored in the vehicle's computer's memory as a

2   Code.  In this case, the repair order indicates a code P0102.  P0102 is a defect

3   related to the "Mass Air Flow Sensor".  The technician claims that he found an

4   unspecified fault in the wiring between two components in the vehicle's electrical

5   system and repaired it.  There are several problems with the technician's alleged

6   repair in this case.

7          19.    First, because there is a history of the vehicle stalling without a check

8   engine light on, it is improper to assume that simply repairing the failure that

9   related to the check engine light would resolve the stalling problem.  Again, a

10  stalling concern is a very dangerous condition.

11         20.    Second, I have inspected the site of the alleged repair.  The repair was

12  not performed properly and has actually damaged the integrity of the vehicle's

13  electrical system and will likely cause problems in the future.

14         21.    The repair appears in Exhibit 56-11, which is a photograph that I took

15  during the vehicle inspection.  The photograph depicts a wiring harness with

16  several different colored pieces of wire, and one white piece of wire that is now

17  separated from the rest with a black coating around portions of it.  These wires

18  were originally wrapped *together* in electrical tape or some other type of shrink

19  wrap, in order to protect them from internal elements like engine heat and vehicle

20  vibration, and external elements like water.

21         22.    The technician who performed this repair claims that he found a

22  defect in the wire that is now separated from the rest, and that he severed the wire

23  and then reconnected the two ends by adding the white piece of wire that appears

24  between to the two black-wrapped sections.

25         23.    I find the technician's claim highly dubious.  Remember, the

26  technician traced this alleged failure from the check engine light, which had only

27  just recently illuminated.  It is very unlikely that any of these wires, in this

28  location, would suffer any damage that wasn't present when the vehicle left the

ANDERSON LAW FIRM
2070 NORTH TUSTIN AVENUE
SANTA ANA, CALIFORNIA 92705
TELEPHONE: (714) 516-2700

1   factory.  And if the damage was sustained at the factory, the check engine light

2   would have come on immediately after the vehicle was sold, and not several

3   thousand miles later.  Thus, I doubt that there was ever any defect in this wire at

4   all.

5         24.     It is far more likely that the technician had spent some time attempting

6   to diagnose the cause of the check engine light problem, and he knew that he

7   would be paid nothing for his work unless he performed a repair.  Accordingly, he

8   invented a problem, cut the wire and spliced it back together.  And according to the

9   repair orders, he was paid 2.6 hours for performing a "repair" that probably only

10  took him 10 minutes to perform.

11        25.     Furthermore, in performing this repair, he should have ensured that

12  the repaired wire was the same length as all the other wires that run along next to

13  it, and then he should have re-wrapped the wires together in order to protect them

14  from the external and internal elements that I discussed above.  In all likelihood,

15  external and internal elements (and particularly vibration) will eventually cause the

16  wire he "repaired" to fail, and the check engine light will come on yet again.

17        26.     Plaintiff's third visit for the Engine Defect was in June of 2008.  *See*

18  Trial Exhibit 34.  Plaintiff returned and the check engine light was on yet again.

19  The fact that the check engine light was on yet again confirms that whatever the

20  mechanic did during the second repair visit was ineffective.

21        27.     Furthermore, although the repair order does not indicate it, I

22  understand that the Plaintiff's son reported that he continued experiencing

23  hesitation on acceleration.  A hesitation upon acceleration can be a less severe

24  form of a stall on acceleration, and thus, the two are likely related.

25        28.     This time, the technician found Code P0172.  The "Mass Air Flow

26  Sensor" is a potential cause for the Code P0172 also.  The fact that the technician

27  found a different code (related to the same component as the last repair) during this

28  visit supports my belief that the vehicle has an Engine Defect which is causing a

ANDERSON LAW FIRM
2070 NORTH TUSTIN AVENUE
SANTA ANA, CALIFORNIA 92705
TELEPHONE: (714) 516-2700

PLAINTIFF'S TRIAL DECLARATIONS

multitude of symptoms depending upon other variable such as load, temperature, vibration, etc.  The Engine Defect likely caused yet another failure symptom which caused the check engine light to come on again.

29.     According to the repair order (Ex. 34), the dealership claims that it found that the fuel level was too high, and so fuel invaded the purge solenoid "hose" and caused it to stick open.  Because a hose cannot be stuck open, I assume that the dealership meant that a valve was stuck open.  Basically, the dealership was claiming that the Plaintiff overfilled his fuel tank and that caused damage to the purge valve.

30.     This explanation is completely nonsensical, and would not explain why Plaintiff repeatedly experienced stalls, hesitation, and various codes beginning in September of 2007.  In fact, the relevant repair manuals show that a common cause of this particular code is a defective mass airflow sensor, which could also have caused the P0102 code that revealed itself during the prior visit.

31.     Again, according to the repair order the technician diagnosed the failure that caused the check engine light; however he did *not* follow proper procedures and likely came up with the wrong answer.  Furthermore, he made no attempt to diagnose the cause of the hesitation and stalling concern which had plagued this vehicle since at least September of 2007.  To his credit, the mechanic *did* contact Mazda during this third visit, but he should have done so during the first and second visits as well.  The mechanic made no effort to contact the Plaintiff or his son in order to gather further information.

32.     Because the mechanic made no effort to diagnose the Engine Defect which had caused the repeated stalls, hesitations, and engine failures, he never repaired that problem.  I understand that Plaintiff's son reports that he has continued experiencing engine hesitations since this last repair.  In my opinion, it is just a matter of time before the vehicle stalls again.

ANDERSON LAW FIRM
2070 NORTH TUSTIN AVENUE
SANTA ANA, CALIFORNIA 92705
TELEPHONE: (714) 516-2700

- 18 -

33.     In my view, three repairs attempts for such a serious problem is a reasonable number of attempts.  Furthermore, given the dealership's history of failing to make a proper effort to diagnose the problems and performing shoddy repairs, Mazda has had a reasonable number of repair attempts.

## Summary of Opinions:  Sway Bar

34.     Based upon my review of all of the records identified above and my experience and expertise, I believe that the vehicle has a defect with the MazdaSpeed sway bar which causes the sway bar to move when it should not and to emit loud, unusual noises ("Sway Bar Defect").  The noises are severe enough that it would cause a reasonable person to question the safety of the vehicle.  In addition, the movement has caused the paint on certain painted surfaces to scrape off, exposing the bare metal to the elements.  Eventually, these parts will likely sustain damage due to oxidation (i.e., rusting).

35.     The Sway Bar Defect has not been repaired.  It is unlikely that Mazda will ever be able to repair the Sway Bar Defect, because Mazda and its dealerships are either unwilling or unable to diagnose the cause of the problem.  The repairs that were attempted in order to repair this problem did not repair the problem.  Finally, the sway bar does not meet Mazda's factory specifications.  These opinions are based upon the following facts:

## Basis for Opinions:  Sway Bar

36.     The MazdaSpeed sway bar kit is depicted in Trial Exhibit 10, which contains the installation instructions.  Page 1 of the instructions contains a drawing which depicts the front and rear sway bar (which are pieces of metal which are painted red) and four red Urethane Stabilizer Bushings (title "4x bushings").

37.     Page 3 of the installation instructions shows the front stabilizer being pushed into what looks similar to a "C-clamp," and is described as a "Stabilizer Bracket."  In between the Stabilizer Bracket and the Stabilizer Bar itself is a Stabilizer Bushing, which again is a red urethane piece.  At the bottom of page 3 is

1  a drawing showing the stabilizer bar being held in place by a stabilizer bracket.

2  The illustration is careful to depict that the "Bushing Stop" is up against the edge

3  of the Stabilizer Bracket/Bushing assembly.  The Stabilizer Bar has two Bushing

4  Stops, which are welded onto the Stabilizer Bar.  Each Stop is intended to hold the

5  stabilizer bar in place so that it will not move left to right through the

6  bracket/bushing assembly when the vehicle is being driven.

7      38.   In Plaintiff's vehicle, the problem is quite obvious.  The bushing stops

8  were welded into the wrong place, and so they do not rest against the

9  bracket/bushing assembly.  The problem is best depicted in Exhibit 56-29, which

10  shows a red stabilizer bar, which is held on by two stabilizer bracket/bushing

11  assemblies.  The Stabilizer bracket (which looks similar to a C-clamp) is painted

12  black and the stabilizer bushing is a red urethane piece underneath.  The stabilizer

13  bushing stops are clearly are not positioned against the bracket/bushing assembly.

14      39.   Again, according to the installation instructions (Trial Ex. 10, p. 3),

15  the bushing stops on the stabilizer bar should be right up again the stabilizer

16  bracket/bushing assembly.

17      40.   This appears to be a manufacturing defect, as the bushing stops are

18  welded onto the stabilizer bar and cannot be moved.

19      41.   And because the dealership has no power to modify Mazda's part,

20  they instead applied some white tape around the areas where movement can be

21  expected in order to silence the noise.  The tape is already fraying in some areas

22  and will eventually come off.  Furthermore, I heard the noise during my inspection,

23  and thus the tape is not effective at eliminating the noise.

24      42.   The damage resulting from this movement is clearly visible in Exhibit

25  56-20 and 56-32, which depicts wear marks at the bottom where the sway bar has

26  moved so far that it hit the bracket/bushing assembly and scraped off the paint.

27      43.   The noise reported by Plaintiff is caused by the sway bar moving

28  because the stops are not located in the correct position.  Plaintiff is likely hearing

ANDERSON LAW FIRM
2070 NORTH TUSTIN AVENUE
SANTA ANA, CALIFORNIA 92705
TELEPHONE: (714) 516-2700

PLAINTIFF'S TRIAL DECLARATIONS

the sway bar moving through the bushing/bracket assembly and eventually banging against the sway bar where it bends.  When I inspected Plaintiff's vehicle, I actually heard the noise caused by the sway bar movement.

44.     The stabilizer bar, along with detailed specifications, appears at Trial Exhibit 61.  I understand from Plaintiff's counsel that Defendant's counsel did not produce this document until shortly before trial.  Upon reviewing the sway bar specifications, it became obvious why Defendant's counsel withheld this document:  It shows that the sway bar currently installed on Plaintiff's vehicle does not comply with the factory specifications.

45.     Specifically, the distance between the sway bar stops stated on Exhibit 61 is *wider* than the actual sway bar stops on the sway bar that is on Plaintiff's vehicle today.  In short, it appears that the sway bar does not comply with Mazda's own specifications.

46.     The repair orders related to this concern support my conclusions.  The first repair visit for this concern occurred in August of 2007 (Ex. 12).  At that time, the dealership verified that the noise was occurring and decided that it was loud enough to justify performing a warranty repair.  The dealership found a "poor fit" between the stabilizer bar and the bushings.  Instead of repairing the "poor fit" (which is evident from the pictures I reference above), the dealership simply applied some grease to the bar and reinstalled it.  This repair, like all the repairs after it, was merely a band-aid.  It could temporarily quiet one potential source of noise, but it did nothing to address the defect.  To date, Mazda has failed to answer this basic question:  How does applying grease cure a poor fit?

47.     During the second visit in early September of 2007, the dealer did exactly the same thing, with precisely the same results.  *See* Ex. 13.

48.     On the third visit in late September of 2007, the dealer replaced the stabilizer bar bracket because it did not fit properly.  Again, replacing the bracket

A NDERSON  L AW  F IRM
2070 NORTH TUSTIN AVENUE
SANTA ANA, CALIFORNIA 92705
TELEPHONE: (714) 516-2700

- 21 -

1    did nothing to repair the problem, which is caused because the bushing stops are

2    too close together.

3         49.     On the fourth visit, the dealership improperly attributed the problem

4    to the front stabilizer bar.  I am not clear whether the Plaintiff reported the problem

5    coming from the front.  In all likelihood, however, the Plaintiff was still hearing a

6    noise from the rear, but the noise likely sounded as if it was coming from the front.

7    The dealer re-tightened the stabilizer bar end links.  Again, the dealer did nothing

8    to repair the problem.

9         50.     During the fifth visit, in November of 2007, the dealer claimed to

10   have driven the car 40 miles and found no abnormal noise.  The repair order belies

11   that claim, and shows that the vehicle had 2,768 miles when it came into the shop

12   and have 2,768 miles when it left the shop.

13        51.     Again, the dealership engaged in virtually no effort to diagnose or

14   repair the concern on this occasion, and the failure was likely caused by the "shop

15   comeback" policy.  Under the shop comeback policy, when a dealership performs

16   warranty repairs for a defect, if the vehicle "comes back," and the repairs must be

17   performed again, the shop, and the mechanic, must do the repairs at their cost, and

18   Mazda will not reimburse them.  As a result, once a dealership has attempted a

19   repair, there is a strong economic incentive to find no problem, or a different

20   problem, during repeat visits.

21        52.     During the sixth visit, in December of 2007 (Exhibit 19), the dealer

22   again found an "improper fit" with the stabilizer bar, and replaced the stabilizer bar

23   entirely.  Again, as depicted in the Exhibit 56-20, this did nothing to repair the

24   problem, because the new stabilizer bar apparently has the stops in the wrong place

25   as well.  Interestingly, the dealer actually attached a page from the installation

26   instructions to the repair order (See Page 3) showing that the bushing stop should

27   be right against the stabilizer bracket/bushing assembly.

28

ANDERSON LAW FIRM
2070 NORTH TUSTIN AVENUE
SANTA ANA, CALIFORNIA 92705
TELEPHONE: (714) 516-2700

53.     Plaintiff's seventh and final visit for the stabilizer bar problem came in January of 2008 (Ex. 21).  Plaintiff requested that the dealer remove the stabilizer bar.  After some discussions between Plaintiff and the dealership, the dealership instead adjusted the bushings by installing the white tape that appears in the photographs that I described above.  Again, this repair did nothing to cure the problem, which is that the bushing stops are in the wrong place.

### Use, Value, and Safety of the Vehicle

54.     Plaintiff's use of the vehicle has been substantially impaired.  The unrepaired defects substantially diminish the quality of the use of the vehicle.  They cast doubt on the integrity of the vehicle and would cause a reasonable person to be concerned about the vehicle's longevity and safety.

55.     When a consumer buys a new vehicle, he pays a premium because the product is new and warranted to be free of defects.  In return, he is supposed to receive peace of mind and a trouble free product.  Although Plaintiff paid for a new product, he did not receive the peace of mind and lack of trouble that is supposed to accompany a new vehicle.  The unrepaired defects are distracting and could cause the driver to divert his attention from driving.

56.     The value of the vehicle has been substantially impaired.  Based upon my inspection and the fact that the vehicle has defects that cannot be repaired despite reasonable efforts, the vehicle has virtually no value.

57.     There is an ample supply of high quality used vehicles already on the market.  Any dealer that knew the true condition of the vehicle would refuse to buy it unless it intended on passing it off to someone else without disclosing the problems.  Anyone in the industry would consider this vehicle a lawsuit waiting to happen.

58.     No retail buyer acting rationally would purchase this vehicle if he knew that the vehicle had a defect which could not be repaired after a reasonable

ANDERSON LAW FIRM
2070 NORTH TUSTIN AVENUE
SANTA ANA, CALIFORNIA 92705
TELEPHONE: (714) 516-2700

1   number of repair attempts.  This is precisely why Defendant has refused to

2   repurchase it.

3         59.    The wholesale and retail price guides (such as the Kelley Blue Book)

4   do not accurately reflect the value of this vehicle.  None of the prices guides are

5   intended to accurately reflect the value of a product that has a defect that cannot be

6   repaired within a reasonable number of repair attempts.

7         60.    The safety of the vehicle has been substantially impaired.  The

8   unrepaired defects are distracting and could cause the driver to divert his attention

9   from driving.  A reasonable consumer would fear for his safety when driving this

10  vehicle because both a stalling and a hesitation concern can cause a collision.

### Defendant's Vehicle Inspection

11

12        61.    I was present at Defendant's vehicle inspection and have read the

13  reports of Defendant's two expert witnesses.  Based upon my experience, the

14  Defendant appears to have conducted the inspection with a design to avoid finding

15  any problems.  Furthermore, Defendant's expert has completely ignored the

16  obvious defects with this vehicle and has falsely claimed that the tire replacement

17  prevents them from diagnosing the true cause of the concerns.

18        62.    Defendant began by taking dozens of photographs of portions of the

19  vehicle that have nothing at all to do with the defects claimed, including the floor

20  mats, steering wheel radio controls, the contents of the owner's manual packet that

21  was in the glove box, the contents of the center console, and a window sticker that

22  Plaintiff's son had put on the car advertising LibertyBoardShop.com.  *See* Trial

23  Exhibits 65-1 through 65-19, 65-53 to 65-56.

24        63.    Defendant also took numerous photographs of minor damage that

25  appears on the wheels and fenders.  *See* Trial Exhibits 65-20 to 65-30, 65-41, 65-

26  44 to 46, 65-50, 65-52.  This damage has absolutely nothing to do with the defects.

27  Rather, it was likely caused by parking the vehicle too close to the curb and driving

28  in and out of parking spaces.  These problems are very common, especially with

ANDERSON LAW FIRM
2070 NORTH TUSTIN AVENUE
SANTA ANA, CALIFORNIA 92705
TELEPHONE: (714) 516-2700

teenage drivers who have just begun driving.  Any reasonable mechanic already knows this, and Defendant's effort to claim that this evidences abuse is simply dishonest.

64.     When Defendant took the vehicle on a test drive, Defendant's experts loaded the vehicle with four full-sized adults.  Any competent mechanic understands that suspension issues can be affected by vehicle load.  And most vehicles are driven by solo drivers.  Here, the primary driver of this vehicle is a relatively light teenage male.  The only reason why Defendant would fully load the vehicle in this manner was to ensure that the vehicle had an unusual load and would *not* perform in the same manner as it did when Plaintiff's son drove it.

65.     Despite that fact, I heard the noise easily while watching Defendant's personnel drive the vehicle over a speed bump at the dealership and when pushing the vehicle from side to side while unloaded.

### Tire Related Issues

66.     I have seen numerous Mazda advertisements for the Vehicle which is the subject of this action and for Mazda vehicles generally.  Mazda markets this vehicle (and its whole line of vehicles) as sports cars.  Mazda's current "tag line" is "zoom zoom," and many of Mazda's television advertisements contain video of its vehicles negotiating S-curves.  Mazda's promotional materials for this vehicle indicate that it has a "sport tuned suspension."  Mazda's sales brochure (Trial Exhibit 45) is typical of this advertising.  It contains numerous pictures of the vehicle with a blurred background, and contains numerous passages suggesting that the vehicle is capable of exemplary acceleration and handling.  *See* Ex. 45-8, 45-15, 45-17, 45-21, 45-22 to 45-24.

67.     In fact, Mazda sells a factory MazdaSpeed sway bar for this vehicle to improve performance during cornering, and Plaintiff appears to have purchased it for that purpose.

ANDERSON LAW FIRM
2070 NORTH TUSTIN AVENUE
SANTA ANA, CALIFORNIA 92705
TELEPHONE: (714) 516-2700

68.     I have reviewed the expert witness report from Mazda's expert.  His claim that viewing the tires would have allowed him to determine whether Plaintiff's driving style contributed to the problems is inaccurate.  This vehicle is marketed as a sporty car, and should be capable of being driven hard.  If it is not capable or doing so, then it is defective.

69.     Hard driving is irrelevant to the problems with the sway bar.  The problem with the sway bar is that it has a defective design.  The purpose of the sway bar is to provide stability from one side of the vehicle to the other when cornering.  As a result of the defective design, the sway bar moves while the vehicle is being driven and rubs against the body of the car.  When it moves, it makes a loud clanking noise.  I heard this noise during ordinary driving, and thus, the sway bar is moving during ordinary driving.  I have also taken photographs which depict wear marks as a result of sway bar rubbing against the car.

70.     Mazda's only real attempt to repair the problem was to apply tape to the bars to mask the noise.  This attempted repair is like a band-aid.  It masks the problem, but it will do nothing to correct it.

71.     Whether Plaintiff's son drove the vehicle hard is thus irrelevant for three reasons.  First, if the vehicle is not capable of being driven hard, then it is not performing in accordance with Mazda's advertising, which indicates that the vehicle is a sports car and is capable of hard driving.  Second, the problem occurs during normal driving, and there is no way that the type of hard driving that would be depicted on the tires could contribute to the problem.  Third, no matter how hard you drive this vehicle one could not cause the weld holding the bushing stop to fail, the bushing stop to move inward and re-weld itself and repaint itself.

72.     I agree that certain types of abuse could damage the sway bar.  For example, if the car were crashed in the rear end or on the side near the sway bar, that could damage the sway bar or the part of the car where the sway bar attaches.

ANDERSON LAW FIRM
2070 NORTH TUSTIN AVENUE
SANTA ANA, CALIFORNIA 92705
TELEPHONE: (714) 516-2700

1  However, that kind of abuse would not be evident on the tires.  Rather, it would be

2  evident on the body of the car itself.

3       73.    Hard driving is also irrelevant to Plaintiff's stalling concern.  The

4  stalling concern is caused by a defect in the engine, the emissions control system,

5  or the transmission.

6  ///

7  ///

8  ///

9  ///

10 ///

11 ///

ANDERSON LAW FIRM
2070 NORTH TUSTIN AVENUE
SANTA ANA, CALIFORNIA 92705
TELEPHONE: (714) 516-2700

PLAINTIFF'S TRIAL DECLARATIONS

74.     I have acted as an expert witness in hundreds of automobile lemon law cases.  In the majority of those cases, the consumer continues using the vehicle while the action is pending.  When doing so, the consumer must continue to maintain the vehicle and perform regular oil changes and tire replacements.  If he fails to do so, the manufacturer will claim that the warranty is void because the maintenance schedule was not followed.

I declare under penalty of perjury that the foregoing is true and correct.

DATED:  June 2, 2009                          See Next Page for Signature

                                             DAN CALEF

ANDERSON LAW FIRM
2070 NORTH TUSTIN AVENUE
SANTA ANA, CALIFORNIA 92705
TELEPHONE: (714) 516-2700

PLAINTIFF'S TRIAL DECLARATIONS

74.    I have acted as an expert witness in hundreds of automobile lemon law cases.  In the majority of those cases, the consumer continues using the vehicle while the action is pending.  When doing so, the consumer must continue to maintain the vehicle and perform regular oil changes and tire replacements.  If he fails to do so, the manufacturer will claim that the warranty is void because the maintenance schedule was not followed.

I declare under penalty of perjury that the foregoing is true and correct.

DATED:  June 2, 2009

DAN CALEF

ANDERSON LAW FIRM
2070 NORTH TUSTIN AVENUE
SANTA ANA, CALIFORNIA 92705
TELEPHONE:  (714) 516-2700

ANDERSON LAW FIRM
2070 NORTH TUSTIN AVENUE
SANTA ANA, CALIFORNIA 92705
TELEPHONE: (714) 516-2700

1   **DECLARATION OF LUCY KASPARIAN**

2   I, LUCY KASPARIAN, hereby declare as follows:

3   1.   I am one of the attorneys for Plaintiff in this action.  I have been

4   handling automobile lemon law cases since 2004.

5   **Repurchase Demand**

6   2.   On February 4, 2008, I sent a letter to Mazda North American

7   Operations ("MNAO"), the warrantor for Plaintiff's vehicle.  Trial Exhibit 22 is a

8   true copy of the letter that I sent to Defendant.  In the letter, I advised Defendant of

9   the problems with Plaintiff's vehicle and requested that Defendant repurchase the

10   vehicle pursuant to California Civil Code section 1793.2(d)(2).

11   3.   On February 8, 2008, I received an e-mail from Brian Collins at

12   MNAO refusing to repurchase the Vehicle.  Trial Exhibit 23 is a true copy of the e-

13   mail that I received from Mr. Collins.

14   4.   Because Defendant's counsel refused to repurchase the vehicle, we

15   filed this action.  Almost immediately after we filed this action, Defendant changed

16   its position completely.  Defendant claimed that it wanted to repurchase or replace

17   the vehicle pursuant to Civil Code section 1793.2(d) (thereby admitting that it

18   should have done so before), but each offer that it made was deficient because it

19   included conditions and/or offsets that are not permitted by Civil Code section

20   1793.2(d)(2)(B).

21   **Tire Issues**

22   5.   In lemon law actions, it is common for the consumer to continue using

23   the product while the action continues.  When that product is a vehicle, the

24   consumer must continue to maintain the vehicle and perform regular oil changes

25   and tire replacements.  If he fails to do so, the manufacturer will claim that the

26   warranty is void because the maintenance schedule was not followed.

27   6.   Because consumers do not usually contact me to file a lemon law

28   claim until a year or more after they buy the vehicle, because it usually takes

PLAINTIFF'S TRIAL DECLARATIONS

1  another year to get to trial, and because tires typically last between 10,000 and

2  25,000 miles, it is not uncommon for consumers to replace the tires on their

3  vehicles at least once while a lawsuit is pending.

4       7.     In response to Defendant's vehicle inspection demand, Plaintiff

5  objected to the demand because it failed to describe the specific testing or the

6  manner in which the inspection would be performed as required by Rule 34 of the

7  Federal Rules of Civil Procedure.  Nevertheless, Plaintiff agreed to "permit the

8  Defendant to perform a visual inspection of the vehicle and to photograph and/or

9  videotape the vehicle" and to permit a reasonable test drive.

10       8.     I have always understood Rule 34 to require the Defendant to describe

11  the manner in which the inspection and testing will be performed.  Had Defendant

12  done so in this case and explained that it intended to inspect the tires, I would have

13  informed my client of this fact and made sure that the tires were not replaced.

14       9.     Prior to the inspection, I had no reason to believe that the tires on

15  Plaintiff's vehicle were in any way relevant to the action.  Had Defendant's

16  counsel advised me that tire wear was important or that it wanted to perform any

17  inspection of the tires, I would have instructed my client to retain them.  I first

18  learned that the tires were an issue at the inspection when Mazda advised me that it

19  wanted them.  I immediately called my client and the place where the tires had

20  been replaced, and was informed that the tires had not been saved.

21       I declare under penalty of perjury that the foregoing is true and correct.

22  DATED:  June 2, 2009

23                         See Next Page for Signature

24                         LUCY KASPARIAN

25

26

27

28

ANDERSON LAW FIRM
2070 NORTH TUSTIN AVENUE
SANTA ANA, CALIFORNIA 92705
TELEPHONE: (714) 516-2700

1  another year to get to trial, and because tires typically last between 10,000 and
2  25,000 miles, it is not uncommon for consumers to replace the tires on their
3  vehicles at least once while a lawsuit is pending.

4      7.      In response to Defendant's vehicle inspection demand, Plaintiff
5  objected to the demand because it failed to describe the specific testing or the
6  manner in which the inspection would be performed as required by Rule 34 of the
7  Federal Rules of Civil Procedure.  Nevertheless, Plaintiff agreed to "permit the
8  Defendant to perform a visual inspection of the vehicle and to photograph and/or
9  videotape the vehicle" and to permit a reasonable test drive.

10     8.      I have always understood Rule 34 to require the Defendant to describe
11 the manner in which the inspection and testing will be performed.  Had Defendant
12 done so in this case and explained that it intended to inspect the tires, I would have
13 informed my client of this fact and made sure that the tires were not replaced.

14     9.      Prior to the inspection, I had no reason to believe that the tires on
15 Plaintiff's vehicle were in any way relevant to the action.  Had Defendant's
16 counsel advised me that tire wear was important or that it wanted to perform any
17 inspection of the tires, I would have instructed my client to retain them.  I first
18 learned that the tires were an issue at the inspection when Mazda advised me that it
19 wanted them.  I immediately called my client and the place where the tires had
20 been replaced, and was informed that the tires had not been saved.

21     I declare under penalty of perjury that the foregoing is true and correct.
22 DATED:  June 2, 2009

LUCY KASPARIAN

ANDERSON LAW FIRM
2070 NORTH TUSTIN AVENUE
SANTA ANA, CALIFORNIA 92705
TELEPHONE: (714) 516-2700